Good morning, everyone. Judge Hamilton and I are so happy to have our newest member of the Seventh Circuit, Judge Candace Jackson Acumi join us today. It's the first opportunity we've had to sit with her. And it's a wonderful day. So welcome, everyone. I think we're ready to begin. And so we'll call the first case. And that first case is 21-1692. And good morning, Mr. Hillis. Let's see. Where is Ms. Boyle, though? What have you done with Ms. Boyle, Mr. Hillis? Ms. Boyle is here. She's present in court, I believe, Judge. Oh, my goodness. Unfortunately, I cannot see her. She's where all of us wish we were. Oh, my goodness. No, I cannot see you, Ms. Boyle. You're free to make faces at me. All right. Go ahead, Mr. Hillis. Thank you. Good morning. May it please the Court, Ms. Boyle. My name is Daniel Hillis. I'm with the Federal Public Defender's Office. I represent Terrence Shaw. I'll begin with Issue 1, which is an issue that we agree the government has properly evoked waiver. And I mention it only because I noticed that when I excised the portion of my brief where we were opposed to contest that, it threw off the pagination. So I apologize to the Court. But moving on to the merits of the remaining claims, I would note that there is a TAPIA error here. TAPIA, of course, prevents the District Court from considering the need for rehabilitation when imposing a sentence. And here, although the guideline range was eight to 14 months imprisonment, or rather the policy range of the guidelines, the District Court imposed a 24-month sentence. The judge said he was imposing that 24-month sentence so Mr. Shaw could, quote, benefit from the, quote, programs provided in prison and emerge a better person. But Mr. Hillis, forgive me, but by the time of the sentencing, Mr. Shaw had already served a few months, and so only 18 to 20 months remained. So how could the sentence length have been tied to the 24-month RDAP program? And let me just say that the complaint about the Court's mention of available rehabilitation programs may have come about because defense counsel expressly argued that the Court shouldn't be the rehabilitation that went by the wayside. So, you know, that's at 50-51 of the sentencing transcript. And defense counsel also raised rehabilitation at page 44 of the transcript. I mean, in a way, counsel may have invited this rehabilitation discussion. Judge, I credit you with being a sharp-eyed former prosecutor. There were an invited-er argument that were made. I think the government would be in better position to make that sort of claim, but it didn't. And ultimately, though, even if the defense did say all of those things, TAPIA still prevents the judge from considering the need for rehabilitation. And I would say that the errors— Wait, wait, wait, wait, just a second. That's the second time you said it prevents the judge from considering the need for rehabilitation. It's a much finer balance that has to be struck, isn't it? It is, Judge. So I don't mean to oversimplify, but I will say that my client, having already served several months in prison, the RDAP program, if there was an implicit eye on that, that was motivating a wrong decision ultimately at the length because my client won't be eligible to participate in RDAP having served the many months that he did prior to the imposition of sentence. But Mr. Hillis— Go ahead, go ahead. Your contention is not that the judge lengthened it so that he could participate in RDAP, but just the notion was rehabilitation generally and whatever programs the federal prison might have. Isn't that correct? That is correct, Judge. But I'm saying that it may have been the RDAP that animated the  that we think is a problem in and of itself. I thought, if I could follow up on the RDAP point, because you have emphasized that, I thought we had indications that Mr. Shaw had lied to either the court or the probation officer about whether he currently had a substance abuse problem. I think there was a question about that, Judge. I'm not certain that was ever decided in the district court whether he lied on that. There seemed to be a lot of misinformation the prosecutor had where it was assuming that its lack of knowledge or lack of proof on various things was proof that Mr. Shaw was lying on things about COVID status, et cetera. Those things ultimately turned out to be untrue. He was COVID positive. And the other things that the prosecutor talked about didn't seem to be borne out by the record either. But anyway... Did he have a substance abuse problem at this stage in his life? I'm not certain that he did, Judge. It wasn't diagnosed that he did. He has previously used substances. Okay. So let me, if I could get back to the, I guess, the center of your TAPIA argument. Is there any problem with the sentencing judge encouraging a defendant or saying that he hopes the defendant will take advantage of whatever programs are available to him in prison? No. If he had just expressed a general effort to encourage that, then that's not wrong. But where he expressly ties the length of the sentence to the consideration of the need for rehabilitation, I think that we're in Cobb, Hubecko, and DeVasquez-Mendez case, the last two being from the First Circuit. So that's the distinction that I would draw, Judge. The district court should be careful in explaining what he is doing and why. It sounds like it's a minefield for the district judge, given 3553A's consideration of rehabilitation and other correctional programs, right? You'd be perfectly entitled to appeal if the judge didn't address such matters. If it was a principle argument, mitigation perhaps, but that's not what we're contending here, and that's not ultimately how it was framed. So I think that the easy way for the district court to steer clear is just be careful. Let's look at what TAFIA requires. Careful and say what? If you're Judge McDade in this case, and you want to encourage Mr. Shaw to take advantage of any available rehabilitation programs in prison, what can you say that would not, in TAFIA? Well, there's a linkage problem here about 24 months. I would suggest that is the first thing, that there seems to be a direct linkage to the length of the imprisonment that is tied to the RDAP. So it's tied by having the two sentences together? Is that the point? If you had a paragraph in the transcript between, would that make a difference? It makes it for a harder argument, Judge, but I think that the linkage is pretty apparent. And what the judge needs to say, maybe he needs to say less. Not tie in rehabilitation. Encourage people to be better people, but to say, go in and participate in programs and use the length of the sentence that I'm giving you so that that can occur, emerge a better person. I think that pretty is pretty explicitly is delving into forbidden territory. Really? If I can move, I'm sorry, Judge. No, no. Okay, go ahead. And it may be a fine point, but it is because the district court's statements and considerations that are expressed in the record that poses the problem ultimately, Judge. So the district court can fashion the language better. But I'll say for the next problem that we see here is the judge also relied on an improper ground, and that is religious consideration to impose sentences. He explicitly said the conduct was a sin. Well, you know, he made clear that the source of second chance, second chances was God or fortune. He used the word fortune three times in that short discussion. Why doesn't that indicate that Judge McDade was simply using sin as a metaphor for a serious fault or transgression in passing up an opportunity? Judge, it seems like, you know, sort of a strange remark in a lengthy hearing rather than some sort of due process violation, doesn't it? Not to me, Judge, because Gardner, the Supreme Court case says it's a due process violation to take religious motives into consideration when imposing sentence. Again, it was an unforced error. The judge didn't say anything about sin. He could expressly limit himself to conversations about or comments about fortune or opportunities, but when you invoke religious principles as a basis for meting out punishment, then we have a problem, and it's not like we can look past the reference to sin to say that the judge otherwise didn't cause a due process problem through his references. The focus has to be on what the judge said, and it's not on balance that he mentioned fortune more times than he mentioned sin, that he mentioned law more times than he mentioned God. If he mentions the improper things that caused the due process violation, there's a basis for relief under Gardner and under Baker, this Fourth Circuit case that we talked about. It's not a cultural reference like the Traxler case from the Tenth Circuit that the government cites in the brief. We have an express reference to a sin, not to a cultural reference like Saul of Tarsus getting knocked off his donkey on the road to Damascus. There was not a literary sense here.  Yeah, you know, for me, this is a very difficult case, I must tell you, because Judge McDade was trying so hard throughout to help the man, it seemed. But ultimately punished him severely in references to religion do not help the judge to escape review. I mean, I know he's not trying to escape review. I don't mean to say it that way, but this does not help to resist an appeal when the judge imports improper considerations that are then expressly contributing to the decision to impose a sentence that's far above the guideline. Do you think, Mr. Hillis, that a judge can take into account the connections between law and morality? Morality is different from religion. So I'm not saying. Thank you, Judge. Is it different from sin and virtue? Virtue and morality are more syllogistic, I suppose, than sin. Sin is a religious principle tied to a particular faith. So not every religion might regard the same context as sin. Judge Jackson. Mr. Hillis, how do you treat the precedent from our circuit in Coe that it's not just a stray mark? I see the remark that you're relying on, but you have to show that the judge impermissibly relied on this factor or replied on this impermissible factor. How do you address that? Linearly, I look at sin and consequence. The judge tied the two things together. So sin is now being used as a basis for the consequence, which is the imposition of the 24-month sentence, as opposed to an 18 to 14-month sentence, Judge. I think it's as simple as that. You asked for three minutes. Do you want to save those three minutes? I would like to just make one brief remark about the variance. So there is a 70% upward variance. I think that the judge has to, of course, in the case law, Miller and Higdon give adequate justification, especially for a larger variance. The larger the variance, the more explanation. And the government points to appendix page 33 that only talks about the normal factors here, the offense conduct and the missed opportunities. And that doesn't satisfy, in our view, either Miller or Higdon. With that, I'd like to reserve the balance. Thank you, Mr. Hillis. Now, let's see if we can find, well, Ms. Boyle. Mrs. Boyle. Ah! Good morning, Your Honors. Good morning. You were under the table all that time. It's good to see you, Your Honors. Good morning. May it please the Court, my name is Catherine Boyle on behalf of the United States. Your Honors, I'd like to turn first to the Tapia error that Mr. Hillis first addressed. And I think Your Honors have really keyed in on a salient point here. One of the defense's main arguments is that this sentence was, in some respect, tied to RDAP. And it's very clear, upon a thorough review of the record, that the sentence was not tied to the RDAP program. Judge Robner, as I think you noted, and as Judge McDade noted at the hearing, it wasn't something he was unaware of. He imposed a 24-month sentence. But in actuality, he said that given Mr. Shaw's time served, the sentence would be about 18 to 20 months. And certainly, it's true that the BOP program statement, 533011, says that normally 24 months are required for RDAP. But in that case, Mr. Shaw didn't have 24 months here. If anything, it seems more likely, given that the government's recommendation was 24 months, that the district court agreed with that recommendation and went along with it. And I also think it's salient. Ms. Boyle, it's not your contention that Tapia only applies if we have an RDAP scenario. We have a judge who's lengthening a sentence so that a defendant can participate in RDAP. Tapia applies if there's anything that's primarily pushing the judge toward rehabilitation for the reason for prison and for the length. Absolutely, Your Honor. I just think this is an important factual issue to clear up, especially given because in a lot of the Tapia progeny, one of the issues is when the judge ties a sentence to RDAP. But I agree, when the judge considers rehabilitative opportunities and those opportunities determine the length of the sentence, that's inappropriate. And additionally, I think as Judge Hamilton noted, just to follow up on a few loose ends from the RDAP point, there was an earlier motion for bond for the defendant to participate in substance abuse evaluation, which the district court denied. And the substance abuse evaluator initially said, based on some statements that were found out not to be true by Mr. Shaw, that he was recommended for this programming. But then later reversed that recommendation when it found out he had misrepresented the nature of his violations of supervised release. And the district court judge- Well, I think that's why we shouldn't even be talking about RDAP here, because I don't think either side is suggesting that he, at this point, by sentencing, he wanted or needed drug treatment. Yes, Your Honor. So I wanted to bring it up because the defense counsel suggested the judge might have had it in mind. But I understand your point and I'll move on. Ms. Boyle, where in the record will we find the court's explanation justifying a sentence 70% above the top end of the guidelines? Even if the court addressed all of the relevant sentencing factors, where in particular did it address the need to go so significantly above the guidelines? Certainly, Your Honor. And of course, the court looked at the policy statements and the 3553A factors. And this court has held that the court- Where did he mention the third? I never saw any mention of those factors. Well- Even, not even once during the sentencing hearing did I hear those, you know, that he mentioned Section 3553A. I found no express reference. Your Honor, there was no express reference to the specific factors, but the district court judge certainly talked about the nature of the offense and Mr. Shaw's history and characteristics. And this court has held on multiple occasions that there is no need for the district court to go through these factors in a checklist fashion. And there's really no need to cite the statute as long as the court is getting at the substance of the 3553A factors, which the court did here. So your argument is simply that the discussion of all of these factors is implicit in the to them. Your Honor, I don't think that a district court judge is obligated to say, I'm discussing the nature and circumstances of the offense and it is under this part of Section 3553A and go through the factors in that sort of checklist form. I do think the district court judge is required to discuss those factors in substance. This court has also held that the district court doesn't need to explicitly say, this is why these factors support a variance. Where the district court's explanation or discussion of the factors supports the variance, that is enough. And here, the district court does. The government had outlined at the hearing how particularly egregious this defendant's conduct was on probation, just repeated violation after repeated violation. And one of the district court's significant focuses during the sentencing was the idea that the defendant had had so many second chances and just continually squandered these otherwise, and with jobs and various other things, and these repeated violations and the defendant's history and characteristics were well explained by the district court and certainly supported the upward variance in this case. Just to return to the Tapia era very briefly, I just would like to follow up. The district court here does mention that he's going to sentence the defendant to a 24-month sentence and discusses rehabilitative opportunities. But I think it's very important to take those comments in the context surrounding them. And though the court does say he hopes that Mr. Shaw is going to look at these programs in a different light during this period of time in prison, that is meant to be in contrast to the prior 13 years in prison, during which the district court clearly felt that Mr. Shaw had not taken advantage of opportunities and, as the district court put it, bettered himself. And the district court was very troubled by that because it saw it as leading to Mr. Shaw's problems on probation with employment. Ms. Boyle, why do you think the judge would not order a psychological examination? For this defendant, Your Honor? Yeah. I'm not sure. I believe the first time that the psychological evaluation was raised was at the sentencing hearing. I don't think there was a deep discussion of the district court's decision to order or not order it. I do know that one of the— Well, he just refused. I mean, he said no, as far as I can tell. Yes, Your Honor. And of course, defense counsel hasn't raised that as an error on appeal. But I presume the court didn't believe that the defendant needed it. He believed the defendant instead sort of needed to attend the other provisions for mental health therapy and other avenues of help that it had addressed, but didn't see the need for a formal psychological evaluation. Your Honor, I'd also like to address this alleged Fifth Amendment violation. As Your Honor has correctly pointed out, and as Mr. Hill has correctly noted, a district court judge cannot let their personal religious views affect the length of a defendant's sentence. But that's not what happened here. We have the district court referencing God and, as Judge Rovner, you noted, three times fortune. And that's really just a reference to fate. This is sort of a colloquial discussion with religious terminology of why Mr. Shaw has refused to take advantage of certain second chances. And again, that was the theme of the sentencing hearing. This is one of the things that really troubled the judge in Mr. Shaw's case. And of course, the judge does use the term sin, but that term is not always used in a very strictly religious sense in terms of influencing the judge's views. The judge here was sort of referring to something he viewed as a highly reprehensible act, which is a way that Merriam-Webster defines sin. And it's apparent from this discussion that it was really aimed at this idea of squandering opportunities. It could be used in the same way a parent might say to a child, it's really a sin to waste all that food. Are they referring to that in a highly religious sense? Not necessarily, but they are referring to it as a really objectionable act that they view, I think as Judge Hamilton noted, as sort of problematic in a moral sense, more so than a religious sense. And we think that the court's, the Tenth Circuit's decision in Traxler supports that. That shows that it is not impermissible to make a sort of loose analogy to religion or faiths, as the judge did here at sentencing. And the Fourth Circuit's decision in Baker doesn't support it. That was a very different case. In Baker, we see the district court expressing personal offense that he believes the defendant is in some way mocking his religious views, and he expresses his personal offense about his own religion during his explanation of the sentence. The Fourth Circuit understandably found that to be inappropriate and vacated the sentence and remanded the case. You know, I'm trying to view the entire sentencing transcript as a whole, and I don't think, you know, this was a real point of reference for Mr. Hillis. But is a judge supposed to compare his upbringing with the upbringing of a defendant? Is that proper? Is that something that's proper? Well, Your Honor, of course, this wasn't raised on appeal, but— I preface. Yes, yes. But as I say, I am looking at this entire sentencing in toto and wondering what was going on here. Well, the judge considered a number of factors during the sentencing, and it's true that the judge did make some certain comparisons to his own upbringing, and in some respects, that was when the judge was expressing sympathy for Mr. Shah. He noted that they had both lost a parent at an early age, which was an argument that Mr. Shah made in mitigation. And, Your Honor, it's not inappropriate for a judge to bring some humanity to a sentencing, to think of their own life. This Court has never held, as far as I know, that a court cannot sort of bring some of their own personal experience to the bench. It would be very difficult, and we'd have judges who were automatons if they couldn't think of the breadth of their own experiencing in sentencing a defendant. I'm not sure you're right on all of that, but go ahead. As you said, it was not brought up, but we judges really try awfully hard to not talk about ourselves in contrast to the defendants. Certainly, Your Honor. I look at this sentencing as a whole and see a judge making an extraordinary effort, very thoughtful effort, to connect with a defendant and somehow try to reach it. That may not happen very often, but the human face of sentencing is very evident on this transcript. I think I noted that when we were speaking to Mr. Hillis, that he was trying very, very hard. I would agree with that. The question, of course, is in trying that hard, did he cross certain forbidden lines? That's the question. I would agree. No question that he had, you know, a lot of feeling about Mr. Shaw. I would agree with that characterization, Your Honor. I do think this was a judge who was trying very hard, and I think the judge's comments about rehabilitation should also be taken in that context, because when you read the entire paragraph surrounding his specific comments on rehabilitation, it really sounds like a motivational speech saying, you know, for 13 years, you hadn't taken advantage. You had all these opportunities when you got out, but I really hope when you serve this next period of time in prison, you are going to look at these opportunities in a different light than you had before, and I do think it was a judge who was trying to connect with and motivate, and I think that's very important. And I think also, just as one final point on the Tapia era, there's very little daylight between the court's comments here and the court's comments in Burroughs, where they specifically contrasted the rehabilitation opportunities available to the defendant in that case as a juvenile, and then discussed the rehabilitation opportunities available as an adult. And this is the same similar sort of contrast here. You know, you had these particular opportunities before, you have these opportunities now during this period of time, and I really hope you take advantage of them for your own sake. If your honors have no further questions, I will rest on the arguments that are brief and ask that the government, ask that this court affirm. Thank you. Thank you so much, Ms. Boyle. Thank you. So Mr. Hillis, you're up. Thank you. So I think, Judge Roper, you are correct to be cautious or to encourage caution, perhaps, among district court judges. Draw comparisons between their life experience and the person that they are sentencing, especially when the person who is imposing the sentence is intellectually gifted, two-time All-America, who has basketball, has lots of opportunities that are entirely dissimilar to most people that he might sentence. But we didn't consider that to be of the type of error that you get traction on, akin to the sort of Milwaukee is burning cases that Judge Randa had, which I think is looming in the background here. We thought the stronger claims are the ones that we presented. And so going forward on those, we're still comfortable making the arguments that we are making. We're worried now to hear some of the comments that if we, on the whole, have references to things that are proper, then we don't need to focus, perhaps, on improper things like religion. That's clearly mentioned here and is prominent. We don't mention sin offhandedly. References to God are things that are invoking religion. And if we were to import those things, we are now allowing, perhaps, somebody not to have review and a chance for reversal. If that is the most important thing and it's only mentioned once, it's enough. And we can't allow, then, for religion to squeeze in. Well, Mr. Hillis, I believe Fortuna was a Roman goddess. Is that right? I believe so, Judge. Right. So is that a reference, then, is the judge invoking polytheistic, pagan religious beliefs by those references? I'm not making that argument. But I'll say that God is a more explicit reference to a Christian, Muslim deity. I mean, a major religion that's still extant, as opposed to, I'm not certain that cultural references in the literary sense are the type that maybe Fortuna is driving at, Judge. They'd be a significant difference in mind. But I will end with this. It starts to sound like viewpoint discrimination or discrimination between different religions, Mr. Hillis, if you can mention the Romans, but not the Christians. Judge, I went with the reference to one God in a general sense, as opposed to multiple gods. But perhaps the better view is to leave out reference to any religion. How about a discussion between free will and determinism, which has an awful lot to do with moral responsibility and correctional law. It does. And Gardner didn't tangle with that. I'm trying to confine my argument more in the contours of Gardner. Okay. Finally, if I may, I'd ask this court to consider Boltinghouse and the explanation that was given. I believe, Judge Robner, you were on that panel. The explanation was inadequate for within guideline sentence in Boltinghouse. This record is not even as good as Bradford record in Boltinghouse was. So Appendix 33, if that's all that we have, I think that we would not be able to find daylight between Boltinghouse, in this case, especially when we have an upward variance of 70%. So with that, Helen, thank you very much. Well, I want to thank you both for such a well-argued case. And the court will take the case under advisement, and you all take care of yourselves. Thank you.